# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 11, 2022

Lyle W. Cayce
Clerk

No. 21-30085

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

ALFONZO JOHNLOUIS,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:18-CR-185-2

Before BARKSDALE, STEWART, and DENNIS, *Circuit Judges*.

CARL E. STEWART, *Circuit Judge*:

This case presents a novel question involving two provisions within the United States Constitution: the United States Postal Service and the Fourth Amendment.[1] Alfonzo Johnlouis moved to suppress narcotics evidence that the Government seized after a letter carrier's thumb slipped

---

[1] In 1789, the states ratified the Constitution with a clause giving Congress the power "To establish Post Offices and post Roads" and "To make all Laws which shall be necessary and proper" for administering, inter alia, the agency. U.S. CONST. art. I, § 8. Two years later, they ratified the Fourth Amendment as part of the Bill of Rights. *Id.* amend. IV.

No. 21-30085

through a hole in a package, initiating an allegedly illegal search. According to Johnlouis, the Fourth Amendment per se applies to letter carriers because they are government actors subject to its warrant requirement. According to the Government, this letter carrier was not a government actor to whom the Fourth Amendment applies, and her inspection of the package did not fall within its purview. The district court agreed with the Government and denied Johnlouis's motion. For the following reasons, we AFFIRM.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On November 3, 2017, United States Postal Service ("USPS") letter carrier Jasia Girard was delivering mail in Lafayette, Louisiana. As she was picking up a package for delivery to 109 Hogan Drive, her thumb slipped through a preexisting hole. After feeling a "plastic bag" containing "little balls" she thought to be marijuana, Girard removed her thumb and decided she would not deliver the package because she did not feel comfortable leaving it "with all those kids around there." She then looked through the hole and observed what appeared to be "aluminum pans with a little Ziploc bag." At this point, Girard lifted a previously torn flap of the package to better assess what was inside and saw hard white rocks. Upon researching "hard white rock substance" on the internet with her phone, she determined that these rocks were probably methamphetamine.

According to Girard, she was "freaked out" and felt morally obligated not to deliver the package on account of the children in the area as well as her experience with a relative's methamphetamine addiction. Instead of leaving it with her supervisor or contacting the Postal Inspection Service—USPS's law enforcement arm—Girard brought this package and two others addressed to 109 Hogan Drive to the property manager, Billie Love.[2] She

---

[2] 109 Hogan Drive is one of a series of houses with a common property manager.

informed Love that she believed the packages contained methamphetamine and suggested that Love may want to call the police. Girard then left but was later contacted by Special Agent Douglas Herman of the Federal Bureau of Investigation to whom she relayed what had happened. As a letter carrier, she received no law enforcement training, and aside from the instant incident, she had never interacted with law enforcement during her employment with USPS.

Lafayette police officer Brandon Lemelle responded to Love's call and met with her at the property manager's office. Love relayed to Lemelle what Girard had told her about the discovery of the suspected methamphetamine. Lemelle also spoke with Herman, who arrived five to ten minutes after him and informed Lemelle that 109 Hogan Drive was a suspected methamphetamine stash house. A K-9 officer sniffed the three packages and "hit," leading Lemelle to believe that they contained narcotics and that he had probable cause for a search warrant that a state judge approved. Execution of the search warrant uncovered a combined eighteen pounds of methamphetamine. In an interview with officers, the owner of the residence stated that Alfonzo Johnlouis had informed her the packages would arrive at her address.

Johnlouis was indicted for (1) conspiracy to distribute and possess with intent to distribute methamphetamine, and (2) attempted possession of a controlled substance with intent to distribute. He subsequently filed a motion to suppress, arguing that the narcotics evidence had been seized in violation of the Fourth Amendment following an illegal search of a parcel by a USPS letter carrier. A magistrate judge conducted an evidentiary hearing at which the relevant testimony was adduced.

Adopting the magistrate judge's report and recommendation, the district court denied Johnlouis's motion. It determined that despite her position as a USPS letter carrier, Girard did not carry out law enforcement

action within the meaning of the Fourth Amendment; as such, it did not apply to her inspection of the package and the contents were not subject to suppression. In the alternative, the district court held that even if Girard did carry out law enforcement action within the meaning of the Fourth Amendment, such action did not rise to the level of misconduct warranting application of the exclusionary rule. Next, it determined that Lemelle's subsequent search of the package pursuant to a warrant was done in good faith and that the contents would have inevitably been discovered. Finally, the district court reasoned that Herman's statement to Lemelle that 109 Hogan Drive was a suspected stash house provided independent probable cause for the search of the package after the K-9 officer hit on it.

Johnlouis ultimately pled guilty to the conspiracy count, and the attempt count was dismissed pursuant to the terms of his plea agreement. The district court sentenced him within the guidelines range to 120 months of imprisonment, followed by five years of supervised release. Johnlouis reserved his right to appeal the denial of his motion to suppress.

## II. STANDARD OF REVIEW

On appeal from a denial of a motion to suppress evidence, this court reviews "the district court's findings of fact for clear error and its conclusions of law de novo." *United States v. Lopez-Moreno*, 420 F.3d 420, 429 (5th Cir. 2005). We may affirm the ruling "on any basis established by the record," *United States v. Ibarra-Sanchez*, 199 F.3d 753, 758 (5th Cir. 1999), and should do so "if there is any reasonable view of the evidence to support it." *United States v. Michelletti*, 13 F.3d 838, 841 (5th Cir. 1994) (en banc) (citations omitted).

## III. DISCUSSION

The threshold question in this case is whether the Fourth Amendment applies to Girard, a USPS letter carrier. This court must decide whether she

No. 21-30085

was a government actor to whom the Fourth Amendment applies at the time she peered into the hole and lifted the flap of the package at 109 Hogan Drive.[3] Although it is evident that Girard was an employee of the federal government, the parties dispute whether this fact alone has Fourth Amendment implications.

### A. *Applicable Law*

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "[O]fficial intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018). "Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable." *United States v. Jacobsen*, 466 U.S. 109, 114 (1984).

Federal courts have "consistently construed [the Fourth Amendment] as proscribing only governmental action; it is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the [g]overnment or with the participation or knowledge of any governmental official.'" *Id.* at 113 (quoting *Walter v. United States*, 447 U.S. 649, 662 (1980) (Blackmun, J., dissenting)). "[T]he arrival of police on the scene to confirm the presence of contraband

---

[3] The Government does not specifically dispute that Girard's actions constituted a search. According to the Government, whether Girard in fact searched the package "need not be resolved, for . . . that conduct was not subject to the protections of the Fourth Amendment." Because the Government does not dispute that Girard in fact searched the package—that is, "examine[d] [it] by inspection," *Kyllo v. United States*, 533 U.S. 27, 32 n.1 (2001) (internal quotation marks and citation omitted)—we assume that a search occurred.

and to determine what to do with it does not convert [a] private search into a government search subject to the Fourth Amendment." *United States v. Villarreal*, 963 F.2d 770, 774 (5th Cir. 1992) (quoting *Illinois v. Andreas*, 463 U.S. 765, 769 n.2 (1983)).

## B. Analysis

Notably, this court's precedents assessing the constitutionality of searches by USPS employees have involved searches by members of the Postal Inspection Service, not letter carriers. *See, e.g.*, *United States v. Osunegbu*, 822 F.2d 472, 474–75, 477–80 (5th Cir. 1987); *United States v. King*, 517 F.2d 350, 351–55 (5th Cir. 1975); *see generally* 39 C.F.R. § 233.1(a) (describing postal inspectors' investigative and arrest powers). However, neither party cites any authority discussing whether a person falls within the ambit of the Fourth Amendment merely by dint of their being a USPS employee. And like the district court, we are "not aware of any case finding that suppression is justified based upon the acts of a letter carrier without any intervening act by a postal inspector or other law enforcement officer[.]"

Moreover, the cases cited by the parties in support of their arguments do not offer a definitive answer. *United States v. Van Leeuwen* and *Ex parte Jackson*, for instance, place within the scope of the Fourth Amendment searches conducted by "postal authorities" and "officials connected with the postal service," respectively. 397 U.S. 249, 251 (1970); 96 U.S. 727, 733 (1877). Yet neither explores the scope of those terms nor casts any light on whether a letter carrier qualifies as an "authority" or "official." Indeed, *Van Leeuwen*—despite containing the above language that the district court, in any event, found to be dicta—is not a case about USPS employees at all; a USPS employee first alerted police to a suspicious package, but the issue in that case was whether a customs agent violated the Fourth Amendment by detaining the package while awaiting a warrant to search it. 397 U.S. at 250–53.

However, although there does not appear to be any authority that expressly endorses Johnlouis's per se approach, there are several cases that suggest being a government employee does not make one a government actor for Fourth Amendment purposes. Each requires something more—namely, a connection to law enforcement.

Consider *Ferguson v. City of Charleston*, 532 U.S. 67 (2001). In this case, public hospital staff conducted urine tests of obstetrics patients who were subsequently arrested after testing positive for cocaine and who brought successful Fourth Amendment claims. The Supreme Court concluded that the "members of [the state hospital] staff [were] government actors, subject to the strictures of the Fourth Amendment." *Id.* at 76. However, in doing so, the Court repeatedly emphasized that these staff members were carrying out the tests "for law enforcement purposes," that it was "law enforcement officials who helped develop and enforce the policy," and that there was "extensive involvement of law enforcement officials at every stage." *Id.* at 69, 73, 84. Crucially, Girard's role as a letter carrier did not involve law enforcement duties, she received no law enforcement training, and she never interacted with law enforcement during her employment with USPS outside of this incident.

Meanwhile, the cases Johnlouis cites from sister circuits undermine his argument because they too underscore the primacy of law enforcement ties in the Fourth Amendment context. *See United States v. Ackerman*, 831 F.3d 1292 (10th Cir. 2016); *Oliver v. United States*, 239 F.2d 818 (8th Cir. 1957). In *Ackerman,* the Tenth Circuit held that the National Center for Missing and Exploited Children was a government actor for the purposes of the Fourth Amendment because Congress imbued it with "many unique law enforcement powers." 831 F.3d at 1298; *see generally id*. at 1295–1300. And in *Oliver*, the Eighth Circuit held that postal employees required a warrant to inspect first-class mail, but the letter carrier who intercepted the suspicious

package "had been serving also as an undercover agent for the Bureau of Narcotics."[4] 239 F.2d at 820; *see generally id*. at 820–23.

Of course, we have "never limited the [Fourth] Amendment's prohibition on unreasonable searches and seizures to operations conducted by the police." *New Jersey v. T.L.O.*, 469 U.S. 325, 335 (1985). "[W]e have held the Fourth Amendment applicable to the activities of civil as well as criminal authorities," including building inspectors,[5] firefighters,[6] teachers,[7] healthcare workers,[8] and, yes, even USPS employees.[9] *Id*. After all, "[t]he basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Mun. Ct. of City & Cnty. of S.F.*, 387 U.S. 523, 528 (1967). "Because the individual's interest in privacy and personal security suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards, it would be anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when [he] is suspected of criminal behavior." *New Jersey*, 469 U.S. at 335 (internal quotation marks and citations omitted).

---

[4] It should be noted that *Oliver* is silent as to who actually performed the search. *See Oliver*, 239 F.2d at 820 (stating only that "the package was opened and inspected" after the letter carrier alerted the USPS superintendent).

[5] *See New Jersey*, 469 U.S. at 335 (citing *Camara v. Mun. Ct. of City & Cnty. of S.F.*, 387 U.S. 523, 528 (1967)).

[6] *See id*. (citing *Michigan v. Tyler*, 436 U.S. 499, 506 (1978)).

[7] *See id*. at 341.

[8] *See Ferguson*, 532 U.S. at 76.

[9] *See, e.g.*, *Osunegbu*, 822 F.2d at 480; *see also United States v. Jones*, 833 F. App'x 528, 537–38 (5th Cir. 2020) (per curiam) (holding that seizure of packages by a contractor hired by the Postal Inspection Service did not violate the Fourth Amendment because the seizure was based on reasonable suspicion).

No. 21-30085

But the building inspectors, firefighters, teachers, healthcare workers, and USPS employees that courts have identified as government actors to whom the Fourth Amendment applies were all carrying out law enforcement functions. The same cannot be said of Girard. Surely her inspection of the package addressed to 109 Hogan Drive does not resemble the "arbitrary invasions by government officials" that the Fourth Amendment was ratified to protect against. It was not even motivated by a desire to investigate a legal violation. The record reflects that Girard's thumb slipped through a hole in a package, and that she inspected this package after feeling its contents because of her concern for children and her experience with a relative. She was not inspecting the package to enforce law. We therefore hold that the Fourth Amendment does not per se apply to Girard. As such, we offer a narrow holding tailored to the peculiar facts of this case and the particular activities of individual government actors. Here, despite working for an agency that employs inspectors who undertake law enforcement activities, Girard is not one of them. Notwithstanding that she works for the government, she is not a government actor to whom the Fourth Amendment applies.

Ordinarily, this resolution would not dispose of Johnlouis's Fourth Amendment claim because he could argue that Girard was a private person acting in the capacity of a government agent by searching the package with the knowledge of, or in order to assist, law enforcement. *See United States v. Pierce*, 893 F.2d 669, 673 (5th Cir. 1990), *cert. denied*, 506 U.S. 1007 (1992). Where a search is conducted by someone other than "an agent of the government," this court has held that it still violates the Fourth Amendment if (1) "the government knew of and acquiesced in the intrusive conduct" and (2) "the party performing the search intended to assist law enforcement efforts or to further his own ends." *Id*. But Johnlouis explicitly disclaims any such alternative argument, calling the district court's characterization of the inspection as a private citizen search "legal error." He maintains that "the

No. 21-30085

letter carrier is a government employee/actor" who "cannot search a Priority Mail, First Class Mail (sealed mail), without a search warrant" even though "none of her job duties entail law enforcement duties." Johnlouis has thus abandoned any argument that the Fourth Amendment applies to Girard outside of his contention that her employment by USPS per se renders her subject to the Fourth Amendment. *See United States v. Charles*, 469 F.3d 402, 408 (5th Cir. 2006).

Accordingly, because the Fourth Amendment does not per se apply to Girard, the district court correctly concluded that she did not perform an unconstitutional warrantless search of a package that could justify the suppression of evidence. We therefore do not reach Johnlouis's arguments with respect to the exclusionary rule, the good faith exception, and the inevitable discovery and fruit of the poisonous tree doctrines.[10]

## IV.  CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[10] Although the special concurrence raises an alternative basis for affirmance, the independent source doctrine was never mentioned in the magistrate judge's report and recommendation, the district court judgment adopting it, and the briefs and oral argument on appeal. "We see no principled basis for addressing [an issue not presented by either side] here." *Rollins v. Home Depot USA*, 8 F.4th 393, 398 (5th Cir. 2021).

No. 21-30085

James L. Dennis, *Circuit Judge*, concurring in the judgment:

"We may affirm the district court's ruling on a motion to suppress based on any rationale supported by the record." *United States v. Ganzer*, 922 F.3d 579, 583 (5th Cir. 2019) (cleaned up). Unlike the majority, I would assume without deciding that the Fourth Amendment applies to a USPS letter carrier like Ms. Girard who searched a package (and did research on what she observed) that she was delivering in the scope and course of her official duties, but would affirm the district court on the alternate ground that the independent source doctrine renders the exclusionary rule inapplicable even if Girard's warrantless search violated the Fourth Amendment. Thus, I concur in the judgment only.

As the majority notes, our court has previously held that a search by a member of the Postal Inspection Service, the law enforcement arm of the USPS, must comply with the Fourth Amendment's strictures. *United States v. Osunegbu*, 822 F.2d 472, 474, 477–80 (5th Cir. 1987). But I've been unable to find a published precedent involving a USPS letter carrier (not a postal inspector). In distinguishing a letter carrier from a postal inspector for purposes of the Fourth Amendment, I am concerned that the majority's "connection to law enforcement" test may prove unworkable for district courts and could lead to confusion rather than clarity in our case law.[1] We should leave resolution of this question—whether there is a difference between a postal inspector and a letter carrier for Fourth Amendment

---

[1] For example, application of the majority's test, in my view, actually leads to the conclusion that the Fourth Amendment applies to Girard. By Girard's own admission, her search of the package was motivated by a suspicion that it contained illegal drugs, and not only did she look inside the package, but she then investigated what she saw by doing an internet search on her phone to confirm her suspicions.

No. 21-30085

purposes—for another case, because this case can be resolved on firmer grounds.

Whether the Fourth Amendment applies and is violated in a given case does not end the inquiry; if the search is unconstitutional, there is still the matter of whether the fruits of the search should be suppressed pursuant to the exclusionary rule. *See Herring v. United States*, 555 U.S. 135, 138 (2009) ("[S]uppression is not an automatic consequence of a Fourth Amendment violation."). In this case, I would hold that exclusion is not warranted, even if Girard's search violated the Fourth Amendment, because an independent source furnished legal grounds to admit the evidence.

In preparing to deliver a package addressed to 109 Hogan Drive, the letter carrier's thumb accidentally slipped into a pre-existing hole in the package, and she felt what she thought was marijuana.[2] She then manipulated the flap to look into the box and saw what she thought looked like hard white rocks.[3] She did an internet search on her phone for "hard white rock substance" and concluded that the package contained methamphetamines. She then delivered the package to a private party, the property manager of the Madeline Place housing complex, which includes 109 Hogan Drive, and told the manager about her suspicion that the package contained methamphetamines, even though suspicious packages are supposed to be returned to the postal inspector per USPS policy. *See* USPS, § 169.2, *Reporting Postal Offenses,* Postal Operations Manual (POM Issue 9, July 2002); USPS, § 223.5, *Suspected Narcotics*, Administrative Support Manual (ASM 13, July 1999). The property manager then called the police.

---

[2] The district court did not find, and Johnlouis does not contend on appeal, that this slip of Girard's thumb constituted a "search."

[3] The Government does not seriously dispute that Girard's actions in lifting the flap of the package to get a look at its concealed contents constituted a "search."

The police in turn obtained a valid search warrant based on independently-developed probable cause, most significantly from a positive "hit" by a drug-detection dog.

The district court, assuming *arguendo* that the Fourth Amendment was violated, ruled in the alternative that the evidence should not be suppressed because the inevitable discovery exception to the exclusionary rule applied. The district court reasoned that the result would have been the same if Girard had turned over the package to the postal inspector, as postal regulations instructed, because the postal inspector would have likely obtained a search warrant based on a drug-detection dog sniff or contacted the police. I agree with the district court's alternative ruling that an exception to the exclusionary rule applies, though I believe the closely-related independent source exception rather than the inevitable discovery exception is a better fit for the facts of the case.

Our court has suggested that the two doctrines are closely related and may even overlap in some cases. *United States v. Grosenheider*, 200 F.3d 321, 328 n.8 (5th Cir. 2000) (characterizing "the two doctrines" as "two sides of the same coin" because "inevitable discovery is no more than 'an extrapolation' of the independent source doctrine" (quoting *Murray v. United States*, 487 U.S. 533, 539 (1988)). The independent source doctrine was first referenced by Justice Holmes, writing for the Court in *Silverthorne Lumber Company v. United States*, 251 U.S. 385 (1920). In *Silverthorne*, Justice Holmes explained that "knowledge gained by the Government's own wrong cannot be used by it" to later obtain the same knowledge by legal means, but that "this does not mean that the facts thus obtained become sacred and inaccessible." *Id.* at 392. Instead, the exclusionary rule would not apply if the same knowledge is "gained from an independent source." *Id.* at

392. The doctrine was developed further in *Segura v. United States*, 468 U.S. 796 (1984), and *Murray v. United States*, 487 U.S. 533 (1988).

Justice Brennan, dissenting in *Nix v. Williams* and joined by Justice Marshall, explained that "[w]hen properly applied, the 'independent source' exception allows the prosecution to use evidence only if it was, in fact, obtained by fully lawful means. It therefore does no violence to the constitutional protections that the exclusionary rule is meant to enforce." 467 U.S. 431, 459 (Brennan, J., dissenting). "The 'inevitable discovery' exception is likewise compatible with the Constitution, though it differs in one key respect from its next of kin: specifically, the evidence sought to be introduced at trial has not actually been obtained from an independent source, but rather would have been discovered as a matter of course if independent investigations were allowed to proceed." *Id.* [4]

Citing the inevitable discovery doctrine, the district court found that "the result would have been the same"—meaning the drugs would have been discovered—if Girard "had complied with USPS procedures by returning the packages to the post office" without illegally searching the package by manipulating its cardboard flap to peer into the pre-existing hole. The court reasoned that, had Girard turned over the package to the postal inspector "based on her initial, accidental discovery"—meaning the inadvertent insertion of her thumb into the pre-existing hole in the package when Girard felt what she thought were balls of marijuana wrapped in plastic between two sheet pans—then the inspector would have likely obtained a search warrant

---

[4] As the Third Circuit explained, "[t]he independent source and inevitable discovery doctrines . . . differ in that the former focuses on what actually happened and the latter considers what would have happened in the absence of the initial search." *United States v. Herrold*, 962 F.2d 1131, 1140 (3d Cir. 1992).

in the same manner as Officer Lemelle and the drugs would have been discovered.

The district court's inevitable discovery analysis relied on, or extrapolated from, Girard's testimony—repeated both on direct examination and on cross—that she decided to deliver the package to the property manager, Billie Love, because of her concern that it contained drugs *after* her thumb went into the package *but befor*e she manipulated the flap to gain a view of the contents:

### On direct examination

Q. At that moment when you pulled out your thumb, what if anything did you intend to do?

A. Not deliver that package, to bring it --

Q. Why not?

. . .

A. Oh. I was going to bring it to the office manager.

### On cross-examination

Q. Okay. Well, I just want to know one thing. When you are there looking at this box and you decided in your mind that it's not good stuff. It's something that appears to you, based upon your research, to be drugs. Why didn't you call your supervisor?

A. I don't know. I freaked out. I was not delivering the box. Once I put my thumb in it and felt what appeared to be drugs, I wasn't delivering it to the door.

At the end of the suppression hearing, the district court stated that it found Girard to be credible. In applying the inevitable discovery doctrine to these facts, however, I think that the district court took a more complicated route than necessary, imagining a hypothetical road-not-taken (inevitable discovery) instead of analyzing what actually happened to determine whether

Officer Lemelle's application for a search warrant that led to the methamphetamines was in fact a result of Girard's search (independent source).

"Under the 'independent source' exception to the exclusionary rule, the government must make two showings in order for a lawful search pursuant to a warrant to be deemed 'genuinely independent' of a prior illegal search: (1) that the police would still have sought a warrant in the absence of the illegal search; and (2) that the warrant would still have been issued (i.e., that there would still have been probable cause to support the warrant) if the supporting affidavit had not contained information stemming from the illegal search." *United States v. Runyan*, 290 F.3d 223, 234 (5th Cir. 2002) (citation omitted) (quoting *Murray*, 487 U.S. at 542).

Though unpublished, our decision in *United States v. Newton* provides a helpful illustration of the doctrine. In *Newton*, a police officer responding to a call about drug sales at an apartment complex smelled marijuana emanating from a specific apartment and then peered through a gap in the apartment's closed window blinds, at which point he saw Newton handling bags of marijuana. 463 F. App'x 462, 465–66 (5th Cir. 2012). When officers knocked on the door, Newton fled in a car, but was later found and arrested while running on foot. *Id.* at 466. Officers obtained a search warrant and searched the apartment. Newton moved to suppress the drugs because the search warrant affidavit included the fact that an officer observed Newton handling marijuana. *Id.* at 465.

Our court, assuming that the officer violated the Fourth Amendment by peeking through the window, held that suppression of the evidence was not required because of the independent source doctrine. Even when the tainted information was removed from the affidavit, the remaining facts—particularly, the odor of marijuana—provided probable cause for a search

warrant of the apartment for drugs. *Id.* at 466. The same is true in this case. Even when the tainted information—here, Girard's observation of the methamphetamines—is removed from the affidavit, the remaining facts in the affidavit provided probable cause for a search warrant for the packages.

As to the first part of the test, whether Officer Lemelle would have sought a warrant in the absence of Girard's search, the record supports the conclusion that the answer is yes. Had Girard delivered the package to Love and told her that she thought the package contained *marijuana*, there is no reason to think that Love would not have called Officer Lemelle or that he would not have investigated the suspicious package and sought a search warrant. Put another way, Girard's unlawful visual inspection of the interior of the package only provided the additional information that Girard thought the package contained one illegal drug—methamphetamines—instead of another illegal drug—marijuana. It is just as likely Officer Lemelle would have responded with the K-9 no matter what kind of illegal drugs he thought were suspected to be in the package. Lemelle testified that he drove to the location with a K-9 because it was "normal" to dispatch a K-9 when responding to a call about a suspicious package. He also testified that, pursuant to department rules, he is required "to at least get a K-9 alert" when seeking a search warrant for a postal package.

As to the second part of the test, whether there would have been probable cause for the warrant absent the information gleaned from Girard's visual interior search, based on our precedent the answer is also yes. Without relying on Girard's visual interior search, but relying only on her alerting the police to a suspicious package based only on her accidental thumb feel, under our precedent there was still sufficient support for probable cause to issue a search warrant because a certified police K-9 conducted a drug-detection sniff and alerted to the presence of drugs in the packages. *See United States v. Ned*, 637 F.3d 562, 567 (5th Cir. 2011) ("We have repeatedly affirmed that

an alert by a drug-detecting dog provides probable cause to search.") (citing *Resendiz v. Miller*, 203 F.3d 902, 903 (5th Cir. 2002) (holding that a "drug-sniffing canine alert is sufficient, standing alone, to support probable cause for a search")).

\* \* \*

Because the record supports affirming the district court's denial of the motion to suppress on an independent source rationale, I concur in the judgment on that ground.