# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
April 4, 2024

Lyle W. Cayce
Clerk

———————

No. 23-30231

———————

United States of America,

*Plaintiff—Appellee*,

*versus*

Courtney D. Clayton,

*Defendant—Appellant*.

———————————————————————

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:21-CR-91-1

———————————————————————

Before King, Ho, and Engelhardt, *Circuit Judges*.

Per Curiam:

On December 16, 2021, a grand jury indicted Courtney D. Clayton on one count of possession with intent to distribute heroin, fentanyl, and cocaine, in violation of 21 U.S.C. § 841(a)(1). During pretrial proceedings, Clayton filed a motion to suppress evidence. After holding a hearing and considering the parties' post-argument briefs, the district court denied Clayton's motion. Clayton entered a conditional guilty plea but preserved his right to appeal the denial of his motion to suppress. He does so now.

We AFFIRM.

No. 23-30231

## I.

As part of a three-month drug trafficking investigation, officers in the East Baton Rouge Sheriff's Office began conducting recorded video surveillance of Courtney D. Clayton's home, which he shared with his mother. In addition, officers placed GPS tracking devices on a black Mercedes Benz and a silver Land Rover associated with the Claytons. Officers began to observe activities often associated with drug trafficking, including Clayton's mother visiting multiple different pharmacies in Texas and repeatedly driving between Texas and Louisiana in a single day. Moreover, a reliable confidential informant claimed that he bought heroin from Clayton at his home, and that Clayton had a courier who would pick up two kilograms of heroin "somewhere west of Baton Rouge" twice a month.

Based on this information, officers applied for, and received, search warrants for both Clayton's home and his Mercedes. However, as officers prepared to execute the warrants, they observed burglars break into and remove items from Clayton's home. Believing that evidence of drug trafficking may have been stolen, officers continued their investigation for another two weeks before seeking a new warrant for Clayton's residence. The officers did not renew their search warrant for the Mercedes. Rather, their new search warrant specified that officers could search Clayton's residence, as well as "all other structures, vehicles, and places on the premises where [evidence] may be found."[1]

On the morning of the execution of the search warrant, officers observed Clayton exit his home and drive away from the residence.

---

[1] When asked why officers did not renew the specific warrant for the Mercedes, former Narcotics Agent Joshua Clark indicated that it was because they felt that the old warrant "fell within the scope of the [new] warrant [they] had received."

According to the post-execution Incident Report, officers "immediately conducted" a stop of Clayton's car, detained Clayton, and proceeded to search his residence and vehicle. Officers discovered a large amount of cash, three cell phones, and controlled substances—specifically heroin, fentanyl, oxycodone, and cocaine—in the Mercedes. Clayton was arrested and transported to the East Baton Rouge Narcotics Office for processing and further investigation. After arriving at the Narcotics Office, Clayton denied selling drugs, but stated that all the items in the car—including the narcotics and cash—belonged to him.

Clayton was subsequently charged with possession with intent to distribute one kilogram or more of a mixture or substance containing heroin, forty grams or more of a mixture or substance containing fentanyl, and a mixture or substance containing cocaine, in violation of 21 U.S.C. § 841(a)(1). Clayton filed a motion to suppress the evidence discovered in the Mercedes, as well as Clayton's incriminating statement to law enforcement. Clayton contended that the search warrant of the Mercedes had become stale, and that officers did not have probable cause to arrest him. Clayton also contended that the Government failed to meet its burden to show that officers advised him of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).[2]

The district court held a hearing on Clayton's motion to suppress. At the hearing, the Government introduced the testimony of Sergeant Eric David and former Narcotics Agent Joshua Clark, two officers who conducted the vehicle stop on the Mercedes. In relevant part, former Agent Clark testified that the two had intended to stop Clayton "immediately"—i.e., as

---

[2] Clayton now concedes that he was properly given a *Miranda* warning, but argues that officers did not honor his invocation of his right to remain silent.

Clayton was "leaving his house" in his car—"for [the] overall safety of the operation," but Sergeant David testified that they were unable to do so because an elderly woman "froze in the middle of the intersection," causing a delay. Still, former Agent Clark testified that they were able to stop Taylor approximately one block—250 yards—away from his home. After the stop, Clayton was handcuffed, placed in the back of a marked police car, and driven back to his residence. Former Agent Clark testified that after returning to Clayton's home, he provided Clayton with a *Miranda* warning. Clark stated that, as far as he could recall, Clayton did not make any statement verbally responding to the *Miranda* warning, but that he indicated through "body language"—the exact nature of which is not apparent from the record—that he did not wish to talk to the officers.

As to the sufficiency of the probable cause supporting the warrant, former Agent Clark testified that he had viewed surveillance video of Clayton's home and had observed activities he believed were consistent with drug transactions. He also testified that he interviewed the confidential informant who had implicated Clayton in drug trafficking and had seized 1.2 pounds of heroin from the informant.

The Government also called Lieutenant James Cooper, who testified that, after being detained, Clayton was brought to the Narcotics Office for booking. Lieutenant Cooper explained that he had presented Clayton with a notice of pending forfeiture detailing the items seized from the Mercedes and had asked Clayton to verify the list. As part of that procedure, Lieutenant Cooper asked Clayton whether the money and narcotics belonged to him. Clayton responded by taking responsibility for all the property in the vehicle, but he denied that he had trafficked drugs. Lieutenant Cooper testified that he did not read Clayton his *Miranda* rights prior to this confession and stated that he did not threaten or coerce Clayton into making the statement.

Following the hearing, both parties filed briefs restating their arguments. The district court issued a written order denying Clayton's motion to suppress. First, the district court determined that the search warrant was supported by sufficient probable cause. Next, citing *Bailey v. United States*, 568 U.S. 186 (2013), the district court held that the Mercedes was stopped within the "immediate vicinity" of Clayton's residence, and thus the warrant for Taylor's home encompassed the search of the Mercedes. Finally, the district court concluded that Taylor was properly provided a *Miranda* warning.

Following the denial of his motion to suppress, Clayton pleaded guilty pursuant to a written agreement that would allow him to challenge the denial of his motion to suppress on appeal. *See* Fed. R. Crim. P. 11(a)(2). He was sentenced to 175 months of imprisonment, followed by five years of supervised release. Clayton timely appealed.

## II.

On appeal, Clayton challenges the denial of his motion to suppress on two grounds. First, Clayton contends that officers conducted an unconstitutional warrantless search of his Mercedes. Second, Clayton argues that, after former Agent Clark read him his *Miranda* rights, he validly asserted his right to remain silent by refusing to speak to former Agent Clark. Thus, Clayton contends that Lieutenant Cooper, by questioning him at the Narcotics Office, failed to "scrupulously" honor his invocation of his right to remain silent, and that the district court erred by failing to suppress his confession.

Generally, "[w]hen reviewing a denial of a motion to suppress evidence, we review factual findings for clear error and the ultimate constitutionality of law enforcement action *de novo*." *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010). "Where, as here, the district

court heard live testimony, our review is particularly deferential." *United States v. Mendez*, 885 F.3d 899, 907 (5th Cir. 2018). And, in addition to deferring to the district court's factual findings, "the court must view the evidence 'most favorably to the party prevailing below, except where such a view is inconsistent with the trial court's findings or is clearly erroneous considering the evidence as a whole.'" *Scroggins*, 599 F.3d at 440 (quoting *United States v. Shabazz*, 993 F.2d 431, 434 (5th Cir. 1993)). "A finding is clearly erroneous only if the court is left with a definite and firm conviction that a mistake has been committed." *Id.* Thus, we will uphold a district court's ruling "if there is any reasonable view of the evidence to support it." *Mendez*, 885 F.3d at 908 (internal quotation omitted).

The Government concedes that this standard applies to Clayton's first argument that officers conducted an unconstitutional warrantless search of his Mercedes. However, the Government argues that plain-error review applies to Clayton's second argument regarding his confession to Lieutenant Cooper because "the basis for [Clayton's] objection during trial [was] different from the theory he now raises on appeal." *See United States v. Green*, 324 F.3d 375, 381 (5th Cir. 2003). As we discuss *infra*, Clayton's arguments fail under either standard.[3] *See United States v. Pursley*, 22 F.4th 586, 591 (5th Cir. 2022); *United States v. Holguin-Hernandez*, 955 F.3d 519, 520 n.1 (5th Cir. 2020).

---

[3] The Government also argues that Clayton's appellate waiver bars this court's review of his *Miranda* claim. For the same reason, we do not reach this issue. *See United States v. Thompson*, 54 F.4th 849, 851 (5th Cir. 2022).

### III.

### A.

We begin with the search of Clayton's Mercedes. The Fourth Amendment guarantees individuals the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "[O]fficial intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *United States v. Johnlouis*, 44 F.4th 331, 334–35 (5th Cir. 2022) (quoting *Carpenter v. United States*, 585 U.S. 296, 304 (2018)). Therefore, a warrantless search is presumptively unreasonable unless the circumstances fall under an exception to the Fourth Amendment's warrant requirement. *United States v. Guzman*, 739 F.3d 241, 245–46 (5th Cir. 2014). Evidence seized in violation of the Constitution—such as evidence unlawfully obtained without a warrant—is subject to suppression. *See Hudson v. Michigan*, 547 U.S. 586, 590 (2006). Here, Clayton argues that the search of the Mercedes was improper because the vehicle was not "on the premises" to be searched, and he was not stopped and detained within the "immediate vicinity" of his home.

In *Michigan v. Summers*, 452 U.S. 692, 705 (1981), the Supreme Court held that a search warrant supported by probable cause "implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." The Court reasoned that three important law enforcement interests, taken together, justify the detention of an occupant who is on the premises during the execution of a search warrant: (1) officer safety, (2) facilitating the completion of the search, and (3) preventing flight. *Id.* at 702–03. In cases following *Summers*, this court extended *Summers*'s logic to vehicle stops of suspects made during the execution of search warrants. *See, e.g.*, *United States v. Cavazos*, 288 F.3d 706, 708, 711 (5th Cir.

2002) (finding that *Summers* extended to vehicle stop two blocks from suspect's home where suspect's behavior justified detention).

However, in *Bailey v. United States*, 568 U.S. 186, 193–201 (2013), the Supreme Court limited its holding in *Summers*, confining it only to the "immediate vicinity of the premises to be searched." *Id.* at 202. The Court reasoned that "[o]nce an occupant is beyond the immediate vicinity of the premises to be searched, the search-related law enforcement interests are diminished and the intrusiveness of the detention is more severe." *Id.* at 201.

The Court specifically addressed each of the three important law enforcement interests articulated in *Summers*. First, as to officer safety, the Court reasoned that when a defendant leaves the premises without apparent knowledge of the search, that defendant "pose[s] little risk to the officers at the scene." *Id.* at 196. While it is true that the suspect could return during the execution of the warrant, or be alerted to the search by a third party, "[u]nexpected arrivals by occupants or other persons accustomed to visiting the premises might occur in many instances," and "[o]fficers can and do mitigate that risk . . . by taking routine precautions, for instance by erecting barricades or posting someone on the perimeter or at the door." *Id.* at 195–96. And, even if a geographical constraint forces law enforcement officers to "choose between detaining an individual immediately (and risk alerting occupants still inside) or allowing the individual to leave (and risk not being able to arrest him later if incriminating evidence were discovered)," that "safety rationale rests on the false premise that a detention must take place." *Id.* at 196. "If the officers find that it would be dangerous to detain a departing individual in front of a residence, they are not required to stop him. And, where there are grounds to believe the departing occupant is dangerous, or involved in criminal activity, police will generally not need *Summers* to detain him," as they can rely on other Fourth Amendment exceptions. *Id.* at 196–97.

Second, as to facilitating the completion of the search, the Court reasoned that this rationale is based on assisting the actual *effectuation* of the search on the premises. *Id.* 197–98. Specifically, "[i]f occupants are permitted to wander around the premises, there is the potential for interference with the execution of the search warrant. They can hide or destroy evidence, seek to distract the officers, or simply get in the way." *Id.* at 197. However, "[t]hose risks are not presented by an occupant who departs beforehand." *Id.* And, to the idea that detention of occupants can assist officers in, for example, opening locked doors or locked containers, the Court held that "[t]his justification must be confined to those persons who are on site and so in a position, when detained, to at once observe the progression of the search." *Id.* at 198. Otherwise, "it would have no limiting principle were it to be applied to persons beyond the premises of the search." *Id.*

Third, as to flight prevention, the Court specifically explained that "[t]he concern over flight is not because of the danger of flight itself but because of the damage that potential flight can cause to the integrity of the search." *Id.* at 199. Were the flight prevention justification unbounded, "the rationale . . . would justify, for instance, detaining a suspect who is 10 miles away, ready to board a plane." *Id.* Instead, the concern here is about "preserv[ing] the integrity of the search by controlling those persons who are on the scene" and preventing them from "leaving with the evidence being sought [at the premises]." *Id.* at 198. Therefore, "[t]his interest does not independently justify detention of an occupant beyond the immediate vicinity of the premises to be searched." *Id.* at 199.

Finally, the Court was also concerned with the "additional level of intrusiveness" that a public detention away from the home carries. *Id.* at 200. "A public detention, even if merely incident to a search, will resemble a full-fledged arrest," and when the detention occurs beyond the "immediate vicinity" of the home, it can involve "an initial detention away from the scene

and a second detention at the residence." *Id.* "In between, the individual will suffer the additional indignity of a compelled transfer back to the premises, giving all the appearances of an arrest." *Id.* As such, the Court confined the *Summers* holding to "the immediate vicinity of a premises to be searched," and specifically overturned a Court of Appeals interpretation of *Summers* that allowed detention of departed occupants "as soon as reasonably practicable," without consideration of spatial limits. *Id.* at 201–02.

Since the Supreme Court decided *Bailey* in 2013, this court has not yet had the opportunity to provide a more specific definition of "immediate vicinity." The Government contends that their stop of Clayton 250 yards away from his home, and their subsequent transfer of Clayton back to the premises to be searched, comported with *Summers/Bailey*, especially in light of the fact that the officers would have stopped Clayton sooner had another car not blocked the officers from effectuating the stop. Clayton, by contrast, argues that 250 yards was too remote from his home as contemplated by *Bailey*, and that none of the important law enforcement interests discussed in *Summers/Bailey* were implicated in his stop.

Be that as it may, we do not, and need not, decide this question today. We may affirm a suppression ruling on any basis supported by the record. *See United States v. McSween*, 53 F.3d 684, 687 n.3 (5th Cir. 1995). Pursuant to the automobile exception to the Fourth Amendment, a warrantless search of a readily mobile vehicle is permitted when law enforcement has probable cause to believe the vehicle contains contraband or evidence of a crime. *See Rountree v. Lopinto*, 976 F.3d 606, 609 (5th Cir. 2020); *United States v. Fields*, 456 F.3d 519, 523 (5th Cir. 2006); *California v. Acevedo*, 500 U.S. 565, 580 (1991). A law enforcement officer has "probable cause to conduct a search when the facts available to [him] would warrant a [person] of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013) (internal quotations omitted).

"The test for probable cause is not reducible to 'precise definition or quantification.'" *Id.* (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). Rather, a showing of probable cause requires only "the kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'" *Id.* at 244 (quoting *Illinois v. Gates*, 462 U.S. 213, 231, 238 (1983)). Probable cause is determined by examining the totality of the circumstances. *Fields*, 456 F.3d at 523.

The district court found that the search warrant for the home contained sufficient probable cause, a conclusion that Clayton does not challenge on appeal. Many of the same uncontroverted facts that established probable cause to search the home for evidence of drug trafficking also apply to the search of the Mercedes. Those facts include the confidential informant's specific, detailed statements about Clayton's drug trafficking activities; the seizure of heroin from the informant; the officers' surveillance of Clayton's home and observation of activity suggestive of drug trafficking; a video-recorded incident in which a known drug trafficker visited Clayton at this home; and GPS tracking data on the Land Rover—a car that Clayton also used—that showed Clayton's mother repeatedly visiting multiple pharmacies in Texas.

In addition, the record indicates that Clayton frequently used his driveway and carport—places where the Mercedes was often parked—to set up narcotics transactions, including one transaction involving a person wearing a Buffalo Wild Wings t-shirt, the same place that Clayton worked and traveled to via both the Land Rover and Mercedes, and the same place that Clayton was headed when he was stopped by law enforcement. While Clayton argues that no officer actually watched him put drugs, money, or cell phones into the Mercedes, and that some of the evidence in the record is arguably somewhat speculative, under the totality of the circumstances—and viewing the evidence in the light most favorable to the Government—we

hold that a reasonable person would have believed that evidence of drug trafficking would be present in Clayton's Mercedes at the time the stop was effectuated. *See Scroggins*, 599 F.3d at 440. As a result, the police had probable cause, the automobile exception applies, and officer's search of Clayton's vehicle was not a violation of the Fourth Amendment. *See Harris*, 568 U.S. at 243–44. The district court did not err by denying Clayton's motion to suppress on these grounds.

## B.

Having decided that the search of Clayton's Mercedes was proper, we move to the constitutionality of denying Clayton's request to suppress his confession to Lieutenant Cooper. Under the Fifth Amendment, no person shall be "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Accordingly, a suspect in custody "must be warned prior to any questioning that he has the right to remain silent." *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010) (quoting *Miranda*, 384 U.S. at 479). If a suspect makes an incriminating statement during a custodial interrogation prior to receiving his or her *Miranda* warnings, that statement is generally inadmissible. *Missouri v. Seibert*, 542 U.S. 600, 604, 608–09 (2004). And, if a suspect invokes his Fifth Amendment right to silence, that invocation must be "scrupulously honored." *Miranda*, 384 U.S. at 479. Here, the parties do not dispute that Clayton was in custody and was subjected to an interrogation when he was questioned by former Agent Clark and, later, Lieutenant Cooper.

Clayton's principal argument is that by asking questions that were likely to elicit an incriminating response, Lieutenant Cooper did not "scrupulously" honor Clayton's invocation of his Fifth Amendment right to silence. However, this argument presupposes that Clayton *validly* invoked his right to remain silent by failing to verbally respond to Clark's warning and

by indicating through body language that he did not wish to speak to officers. In *Berghuis v. Thompkins*, the Supreme Court explained that a suspect's invocation of his right to remain silent must be unambiguous and unequivocal. 560 U.S. at 380–82. If a suspect "makes no statement, the police are not required to end the interrogation." *Id.* at 381. Thus, in order to properly exercise his right to remain silent and "cut off questioning," a suspect must either "say that he want[s] to remain silent or that he [does] not want to talk with the police," or make a similar "simple, unambiguous statement[]." *Id.* at 382.

Here, the record does not show that Clayton made a "simple, unambiguous statement" invoking his right to remain silent. Rather, former Agent Clark testified that Clayton indicated that he did not want to talk "through body language," and that he did not remember Clayton saying "any words." And, to the extent that Clayton *did* say anything to former Agent Clark, the record does not support the contention that whatever was said qualifies as an "unambiguous" and unequivocal invocation of the right to silence. *See Berghuis*, 560 U.S. at 380–82. Therefore, Clayton failed to properly invoke his Fifth Amendment right to silence, and we need not consider Clayton's argument that the officers failed to "scrupulously" honor his assertion of that right.[4] The district court's decision to deny Clayton's motion to suppress was proper.

———————————

[4] To the extent that Clayton argues that Lieutenant Cooper was required to reissue a *Miranda* warning to Clayton before questioning him at the station, his argument lacks merit. Clayton does not cite any precedent in which this court required officers to reissue *Miranda* warnings to an arrestee who did not properly invoke his or her rights, was continually detained, and was questioned within a few hours of arrest. Moreover, this court has "never held that a new recitation of rights is required with every break in interrogation," as it is "'incomprehensible' that over a three hour span[,] [a] defendant [can go] from knowing and understanding the nature of his rights to forgetting them and therefore making an unintelligent decision to speak to police," absent coercion,

No. 23-30231

## IV.

Finding no error in the district court's denial of Clayton's motion to suppress, we AFFIRM.

---

intimidation, or deception. *United States v. Cardenas*, 410 F.3d 287, 294 (5th Cir. 2005) (quoting *Evans v. McCotter*, 790 F.2d 1232, 1238 (5th Cir. 1986)).